402 So.2d 184 (1981)
Charles Joseph BERGERON
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY.
No. 14250.
Court of Appeal of Louisiana, First Circuit.
June 29, 1981.
Writ Denied September 28, 1981.
*185 Paul H. Due, Baton Rouge, and Glynn Long, Donaldsville, for plaintiff-appellee.
Boris F. Navratil, Jr. and J. Rodney Ryan, Baton Rouge, for defendant-appellant Illinois Central Gulf R. Co. and Walter M. Carlton.
Before COVINGTON, CHIASSON and LEAR, JJ.
CHIASSON, Judge.
This is a car-train collision suit involving the operator of the car, Charles Joseph Bergeron, represented herein by his curator, Mitchell Bergeron; and defendants-appellants, Illinois Central Gulf Railroad Company, owner of the train; and its employee-engineer, Walter M. Carlton. The accident occurred on May 21, 1977, at 12:50 A.M. at the 8000 block of Choctaw Drive in the City of Baton Rouge.
Judgment was rendered in favor of plaintiff and against the defendants for $363,836.34 after a four day trial in which the trial judge sat without a jury. Illinois Central timely moved for a new trial based on what it termed newly discovered evidence. Coupled with this motion was a motion to rescue the trial judge based on the existence *186 of an attorney-client relationship between one of plaintiff's counsel and the trial judge. The trial court heard and dismissed both motions rendering written reasons for its actions. These issues were specifically appealed by Illinois Central and we will dispose of these before considering the merits of the case.
For reasons hereinafter stated, we affirm the denial of these motions. First, the grounds for recusal of a trial judge under Louisiana Code of Civil Procedure Article 151 have been held to be exclusive. Southern Builders, Inc. v. Carla Charcoal, Inc., 357 So.2d 638 (La.App. 3rd Cir. 1978); Wm. T. Burton Industries, Inc. v. Busby, 348 So.2d 1328 (La.App. 3rd Cir. 1977); and Barham v. Barham, 337 So.2d 289 (La.App. 2nd Cir. 1976). Illinois Central states as its ground that plaintiff's attorney is representing the trial judge in an unrelated matter. This is not one of the enumerated grounds and therefore the motion was correctly denied.
Second, a motion for recusal of a trial judge is to be made before trial of the matter or at least before judgment. La.C.C.P. Art. 154; Barham, supra; and McNeill v. Continental Casualty Company, 244 So.2d 693 (La.App. 4th Cir. 1971). In this case the motion for recusal was not filed until after rendition of the judgment. Therefore, the motion was untimely and should have been dismissed.
On the motion for a new trial, Illinois Central styles its motion in terms of newly discovered evidence. La.C.C.P. Art. 1972(2). On a motion for new trial based on newly discovered evidence, an affidavit verifying the allegations must be filed. La. C.C.P. Art. 1975 and McDonald v. O'Meara, 149 So.2d 611 (La.App. 1st Cir. 1962). No such affidavit accompanied this motion and the trial court should have dismissed the motion. Nevertheless, "newly discovered evidence" must be evidence important to the cause of the case and not obtainable before or during trial. La.C.C.P. Art. 1972(2).
The newly discovered evidence asserted by Illinois Central is the existence of an attorney-client relationship between the trial judge and one of plaintiff's counsel. This is not evidence even relating to the cause of the case. The trial court was correct in denying the motion for a new trial.
On the merits, our independent review of the record establishes that the facts as found by the trial judge are correct and we approvingly quote therefrom the following:
"... On May 21, 1977, at approximately 12:50 a.m., Charles Joseph Bergeron was driving west on South Choctaw Drive in East Baton Rouge Parish. At this particular point, South Choctaw Drive runs almost due east and west, perpendicular to Airline Highway. Bergeron was approaching Airline Highway from the east.
"South Choctaw drive is intersected, at a point east of Airline Highway, by a railroad spur track. This track crosses South Choctaw Drive at approximately a 45 angle, proceeding across the street in a northwesterly-to-southeasterly direction.
"In addition to the spur track crossing South Choctaw, two other tracks run parallel to South Choctaw along its northern side: (1) an additional siding, or team track, running parallel to but never crossing South Choctaw; and (2) the main east-west line, also running parallel to but never crossing South Choctaw.
"On the night in question, railroad employees had just completed a switching maneuver which left a few cars on the main line, and had positioned the single switch-engine (locomotive) to cross South Choctaw for some additional switching of cars. The switch-engine began to back across the curving spur intersecting South Choctaw Drive.
"At about the same time, Bergeron had left the Villa Lounge, a short distance east of the railroad spur. He was proceeding along South Choctaw toward Airline Highway. At some point, he observed what he later described as a `black hulk' in the roadway. He applied his brakes and left some 100 feet of skidmarks *187 from the rear wheels before he collided with the locomotive. The point of impact on the locomotive, though subject to some dispute, appears to have been at about two thirds of the distance from rear to front, i. e., two thirds of the locomotive had passed the ultimate point of collision before the collision occurred. Bergeron's vehicle apparently never left his proper lane of travel, and the point of collision was within his proper lane of travel.
"On the evening in question, the streets were dry and the skies were clear. The parties agree that the actual crossing was not marked by a `crossbuck' or railroad crossing sign, though there was a crossing indicator some distance east of the crossing.

* * * * * *
"Four railroad employees were involved in the maneuver that night: (1) J. M. Tullier, the engine foreman; (2) Walter M. Carlton, the engineer; (3) Quinn, a `helper'; and (4) Taylor, a `helper'. Tullier had been riding on the engine, but dismounted to protect the crossing of the locomotive on South Choctaw. He placed one `fusee' or flare at the crossing, about ten feet west of the western rail. This was not the side from which Bergeron was approaching. He saw headlights approaching from the east. Then he turned his attention to the west. He had a lantern, but no radio or walkie-talkie. There were some walkie-talkies available, but only the crew members on the train had them, since there were not enough to go around. So far as his testimony indicates, Tullier did not communicate with the engineer about the vehicle approaching from the east. In fact, he took no further notice of the eastern side of the intersection until the accident occurred. "Carlton, the engineer, testified that he was on the east side (nearest Bergeron) of the locomotive as it backed across the spur. After positioning the locomotive so that it could back across the spur, he commenced that maneuver from a stopped position. He estimated his backing speed at one to three miles per hour, along the spur which the parties concede to have been a slight downgrade in the direction in which the locomotive was traveling. He began giving the standard crossing whistle at a point about 150 feet from the road, but did not complete it until the engine was `somewhere around the center line' of the street crossing itself. This particular engine had only one whistle (horn), which faced the front of the engine, a direction somewhere between perpendicular and the direct opposite of the direction of the Bergeron vehicle.
"Carlton testified that while he was on the main line approaching the spur in question, he could see down South Choctaw to the east. And as he entered the spur, he still had vision to the east. But at a certain point, vegetation between the line and the spur, estimated to be ten to thirteen feet in height, obscured his vision....
"At another point, Carlton testified in a similar fashion that he saw approaching headlights to the east before he got to the vegetation, but that during and after the obscuring of his vision by the vegetation, he no longer saw them. In fact, it appeared that once the locomotive began to occupy the crossing, Carlton did not look again to the east, but was looking at Tullier on the side of the road to the west.
"Both Carlton and Tullier in their testimony placed Quinn, the helper, at the back of the engine (i. e., the first part to reach the crossing). He was therefore in perhaps the best position to testify about the approaching Bergeron vehicle. He was present in the courtroom on the day of the trial, but was not called by defendant (his employer). (While the Court does not draw any unfavorable inference from defendant's failure to call Quinn, it is of the opinion that the `equal availability' exception to such an ordinary inference is not intended to cover an instance in which the individual is an employee of a party and would have to be called (if at all) on cross-examination by the opposing party.)
*188 "The only other eyewitnesses to the events surrounding this accident were Bergeron (the injured driver) and Vallo (a friend of his in a following vehicle). Their testimony is similar on most points, though Vallo for obvious reasons remembers a good deal more about the incident than does Bergeron. The two had been at a crawfish boil sponsored by their employer for approximately four hours. They left that location about 10:00 p. m. or 10:30 p. m. and repaired to the Villa Lounge, where they played some pool with friends until after midnight. They departed the lounge at the same time, each to his respective abode. Vallo was following Bergeron in a westward direction on South Choctaw when the accident occurred.
"Vallo estimated his speed and Bergeron's at 40 m. p. h. Though one of the defendant's experts (Dart) speculated that a greater speed (55 m. p. h.) might have been the case, the poor condition of the road surface prior to the crossing makes such a speed very unlikely. Vallo did not see the `fusee' in the roadway; though his windows were down, he heard no horn or bell. He saw the engine as it emerged from the bushes at the edge of the roadway, but saw no lights on it whatsoever. He saw one of Bergeron's brake lights come on, and saw Bergeron's vehicle strike the locomotive. When he reached the Bergeron vehicle, he noticed that the window on the driver side was down.
"Bergeron's own version of the incident is similar, except that he remembered that a car turned onto South Choctaw and came toward him, causing him to dim his lights. So far as his testimony reveals, he saw the engine for the first time when it was in the crossing.
"A great deal of energy and time was spent by both sides on the issue of the alleged intoxication of Bergeron at the time of the accident. The evidence convinces the court that Bergeron had consumed some quantity of beer between the hours of 6:00 p. m. on the night of May 20 and 12:50 a. m. on the morning of May 21. The evidence does not convince the court that he drank any alcoholic beverage other than beer. The testimony of Bergeron himself, of Vallo, of a Villa Lounge employee, and of another lounge customer indicate that the total consumption of beer by Bergeron probably was two beers at the crawfish boil and a similar number at the lounge. No one testified that he appeared not to be in control of his vehicle. Though it is possible that his perception or reaction time might have been slowed by the consumption of alcohol, the defendant did not establish by a preponderence (sic) of the evidence that this was the case. Under the circumstances, the court concludes that the evidence of intoxication was insufficient, and that, even if sufficient, defendant failed to establish a cause-in-fact relationship between the degree of intoxication and the occurrence of the accident. * * *" (References to transcript omitted).
From these facts the trial court held the conduct of Illinois Central's employees to be a cause-in-fact of the accident; the duty owed by the appellants encompassed the risk encountered by Bergeron; and there was a breach of these duties. The court found Illinois Central's employees to be within the course of their employments and, as a result of the breach of their duties, the defendants-appellants were liable to the plaintiff for the damages sustained.
Of the duties found to be applicable by the trial court, three were statutory duties while four were found to be nonstatutory duties. The trial court determined the statutory duties consisted of: (1) La.R.S. 45:561, requiring the railroad to equip their engines with a bell and a whistle or horn which are audible at a distance of 300 yards; (2) La.R.S. 45:562, requiring railroads to maintain a "Railroad Cross Buck" sign at railroad crossings; and (3) La.R.S. 45:841 and 48:382 which require railroad companies to remove vegetation from the railroad's crossing right of way. The breach of the nonstatutory duties, of conducting themselves as reasonably prudent *189 persons under the circumstances, consisted of: (1) the engine foreman's placing a single fusee on the western side of the track although he had seen headlights approaching from the east; (2) the failure to use the available walkie-talkies to communicate between the engineer and the engine foreman; (3) the failure to remove the vegetation if not required by statute; and (4) the failure of the engineer to look again to the east after clearing the vegetation in view of the fact that he had seen headlights from that direction before his vision was obscured by the vegetation. The court held that each of those duties were breached by the defendants and that the risk of harm encountered by the plaintiff was within the ambit of those duties. In addition, no policy considerations could relieve the defendants of these duties.
In regards to defendants' contention that the plaintiff was contributorily negligent, the trial court determined that the defendants failed to prove any contributory negligence or even if they had so proven, they failed to prove a casual relationship to the accident. It further held, even if the defendants proved contributory negligence, the defendants had the last clear chance to avoid the accident.
Defendants list four specifications of error which relate to their liability, but their arguments only attack certain findings of fact of the trial court. Their first argument is based on the finding that Illinois Central had not fulfilled its duty to warn approaching motorists of the train's presence.
The only visible warning given to motorists that night was a single fusee placed on the western side of the tracks, even though Mr. Tullier testified that he saw headlights approaching from the east. We believe under these circumstances, Mr. Tullier's actions were not consistent with what a reasonably prudent person would have done. In addition, no other action was taken by Mr. Tullier to give any other warning to traffic approaching from the east. We feel this inaction on the part of this employee breaches the duty to protect and warn approaching motorists. Manuel v. Missouri Pacific Railroad Company, 264 So.2d 376 (La.App. 3rd Cir. 1972).
Other warnings to Bergeron were also not given, including the positioning of a "Cross Buck" sign at the crossing site, as well as the sounding of the horn or bell within the required statutory distance from the crossing. The evidence clearly establishes there was no "Cross Buck" sign at this particular crossing although the statute requires one. La.R.S. 45:562. In regards to the horn or bell signal, Mr. Carlton stated that he did not start his signal until he was into the spur track and only finished it midway across the street. This also is in violation of the statutory requirement that a signal be given 300 yards in advance. La.R.S. 45:561. Failure to fulfill these statutory requirements, which are intended to give motorists advance warning of approaching trains, results in a breach of the duties owed to approaching motorists and renders the defendants liable. Watson v. Illinois Cent. Gulf R.R., 355 So.2d 1366 (La. App. 1st Cir. 1978).
In their second argument, defendants aver Bergeron was negligent in failing to stop and look for trains at the crossing, especially since he had previously seen trains utilizing this crossing. This court in the Watson decision, supra, did not find any duty on a motorist approaching a crossing to stop and look in view of the legislative enactments of Revised Statutes 32:171 and 172. We follow that decision and find no negligence on the part of Mr. Bergeron on this contention.
The other acts of the plaintiff which defendants try to construe as contributory negligence, were found by the trial court to be without merit. The court determined that the alleged act of speeding, intoxication, and defective brakes were not proven by the defendants. The findings made by the court as to Mr. Bergeron's speed, state of intoxication and the condition of his brakes are supported by the record and are not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
*190 defendants attempt to show contrary findings by reference to their expert witnesses and their testimony as to the facts surrounding the case. The trial court is vested with the discretion of accepting or rejecting expert testimony and unless found to be clearly wrong, it will not be disturbed on appeal. Guidry v. Davis, 382 So.2d 250 (La.App. 3rd Cir. 1980). There was conflicting expert testimony adduced by both sides and the trial court as trier of fact heard and evaluated all of the conflicting testimony. But the facts as testified to by the lay witnesses at the scene of the accident were more probative than was the opinion of any of the expert witnesses. We think the trial court was correct in the assessment of the witnesses and in the conclusions it reached.
For these reasons, the judgment of the trial court is affirmed at Illinois Central's costs.
AFFIRMED.
LEAR, Judge, concurring.
Defense counsel at oral argument conceded that no valid statutory ground for civil recusation could be asserted by defendants herein. The trial judge, accordingly, was eminently correct in denying the post-trial motion sought on the recusation basis.
I wish to go further, however, and state for the record that I fully subscribe to the observations made by the trial judge that under Article 151 of the Louisiana Code of Civil Procedure, a judge has a duty to sit and decide the cases assigned to him until a valid statutory ground for recusation is clearly established, and that the interests of justice in Louisiana would not be served if a qualified judge agreed to recuse himself at the slightest suggestion of any conceivable bias, especially when such suggestion is not made until after judgment has been rendered and signed in a particular case.
The trial judge in the instant matter was fully justified in fulfilling his duty to sit and to decide this case which was assigned to him. His findings of fact and conclusions derived therefrom, which are entitled to be accorded the same weight given to those of any other trial judge, clearly are in all respects supported by the weight of the evidence, and thus clearly warranted rendition of judgment in favor of plaintiff.