958 So.2d 753 (2007)
Kimberly PYLES
v.
Anthony WEAVER and RCI Entertainment Louisiana, Inc. d/b/a Rick's Caberet, A Division of Rick's Caberet International, Inc.
Kimberly Pyles
v.
The Estate of Anthony Weaver, Easton Insurance Company, RCI Entertainment Louisiana, Inc., d/b/a Rick's Cabaret, A Division of Rick's Cabaret International.
Nos. 2006-CA-0348, 2006-CA-0644.
Court of Appeal of Louisiana, Fourth Circuit.
May 16, 2007.
Rehearing Denied July 11, 2007.
*756 Robert G. Harvey, Sr., New Orleans, LA for Plaintiff/Appellant.
Robert E. Kerrigan, Jr., John Jerry Glas, Kerrie T. Belsome, Keidra J. Phillips, Deutsch, Kerrigan & Stiles, L.L.P., New Orleans, LA, for Defendants/Appellants.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY III, Judge DAVID S. GORBATY).
PATRICIA RIVET MURRAY, Judge.
Defendant, RCI Entertainment Louisiana, Inc. d/b/a Rick's Cabaret [hereinafter "Rick's Cabaret"] appeals the trial court's judgment, which awarded $450,000 in damages to the plaintiff, Kimberly Pyles, in her personal injury action and assigned twenty percent (20%) fault to Rick's Cabaret. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
On September 19, 2001, Kimberly Pyles filed the instant petition against Anthony Weaver and Rick's Cabaret alleging that she was injured on February 8, 2001, while working as an independent contractor dancer at a gentlemen's club operated by Rick's Cabaret on Bourbon Street in New Orleans. Ms. Pyles alleged her injuries were caused by defendant Anthony Weaver, a patron of the club, who deliberately threw a heavy rock glass at her, striking her in the face; and by the negligence of Rick's Cabaret in failing to provide adequate security to protect her.[1] The case was tried March 21-29, 2006, and the jury found in favor of the plaintiff and determined that she suffered damages in the amount of $450,000 (including $300,000 for pain and suffering; $100,00 for mental anguish; and $50,000 for past medical costs). The jury apportioned fault as follows: 80% to Anthony Weaver, 20% to Rick's Cabaret, and 0% to the plaintiff. On March 31, 2005, the trial court rendered *757 judgment in accordance with the jury's findings, thereby rendering Rick's Cabaret liable for $90,000 of the total award. Both the plaintiff and Rick's Cabaret moved for a new trial on various grounds.[2] In addition, the plaintiff moved for judgment notwithstanding the verdict.[3] On May 11, 2005, while these motions were pending, the plaintiff filed a motion to recuse the trial judge from consideration of any post-trial motions. The plaintiff's motion to recuse was based upon the fact that six days after rendering the judgment in the instant case, the trial judge had recused himself sua sponte from another matter because of a conflict of interest between himself and two attorneys, one of those being Robert Harvey, who also represents the plaintiff herein.[4] On April 18, 2005, the trial court granted plaintiff's motion and recused himself from considering any post-trial motions in the instant case.[5] Shortly thereafter, the plaintiff asserted an additional motion for new trial based upon Judge Medley's failure to recuse himself prior to the trial of the instant case. The plaintiff argued that Judge Medley's recusal from hearing the post-trial motions in the instant case, as well as his sua sponte recusal, within days of the conclusion of this trial, from other cases involving Mr. Harvey, indicated that Judge Medley also had a conflict with Mr. Harvey prior to trying the instant case, and his failure to sua sponte recuse himself provided grounds for a new trial.
On August 19, 2005, Judge Rosemary Ledet heard the post-trial motions, which included the multiple motions for new trial by both parties. On December 21, 2005, she rendered judgment denying all the motions for new trial,[6] as well as the plaintiff's motion for judgment notwithstanding the verdict.
The plaintiff filed an appeal of the original judgment, as well as of the denials of her motions for new trial on the recusal *758 issue and on the issue of a post-trial affidavit plaintiff contended was newly discovered evidence warranting a new trial. Rick's Cabaret also appealed the judgment, citing as error the trial court's qualification of the plaintiff's expert on security. On July 19, 2006, this court consolidated the two appeals.
Before addressing the parties' assignments of error as to the original judgment, we consider whether the district court erred by denying the plaintiff's motions for new trial.
MOTION FOR NEW TRIALRECUSAL
According to the Louisiana Code of Civil Procedure, a trial court may grant a new trial based upon either peremptory or discretionary grounds. Article 1972 specifies three peremptory grounds upon which a new trial "shall" be granted, namely: (1) when the verdict or judgment appears clearly contrary to the law and the evidence; (2) when a party has discovered new evidence important to the cause which he could not, with due diligence, have discovered prior to trial; and (3) when the verdict has been tainted by juror bribery or juror misconduct In addition to these peremptory grounds, Article 1973 provides that a new trial "may be granted in any case if there is good round therefore. . . ." In reviewing the trial court's denial of a motion for new trial, an appellate court may not disturb the trial court's decision unless there has been a clear abuse of discretion. Warner v. Carimi Law Firm, 98-613 (La.App.5 Cir. 12/16/98), 725 So.2d 592, 597; de la Vergne v. de Lamaze, 95-1866 (La.App. 4 Cir. 2/29/96), 670 So.2d 599, 602; Zatarain v. WDSU Television, Inc., 95-2600 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186.
In the instant case, the plaintiff first argues that Judge Medley's failure to recuse himself prior to trial provides peremptory grounds for new trial under the second prong of Article 1972: newly discovered evidence. According to plaintiff's argument, the "newly discovered evidence" is Judge Medley's April 6, 2005 recusal from another case [hereinafter "the Reuther case"] and his April 14, 2005 per curiam filed in this court explaining that recusal. In the per curiam, Judge Medley confirmed that he had recused himself from trying the Reuther case because of a perceived conflict between himself and the two defense attorneys (one of whom was Mr. Harvey) stemming from a secretly tape-recorded comment made by one of the attorneys indicating Judge Medley had a bias in favor of them.[7] Because Mr. Harvey is also counsel for the plaintiff herein, the plaintiff argues that the information contained in the April 14 per curiam should be considered "newly discovered evidence" justifying a new trial in the instant case because the same conflict of interest existed at the time Judge Medley conducted the instant trial. Specifically, the plaintiff argues that the conflict must have existed in Judge Medley's mind on March 21, 2005, the first day of trial, because Judge Medley was aware at that time of the alleged comment, which was the basis for the conflict.
We cannot accept plaintiff's argument. Judge Medley's conflict of interest with Mr. Harvey, even assuming it existed prior to the trial of this case, is not "evidence" within the terms of Louisiana Code of Civil Procedure Article 1972 because the comment has no bearing upon the substance of the matter to be decided. In an analogous situation, the First Circuit held that where the "newly discovered evidence" asserted by the party moving for new trial consisted *759 of the existence of an attorney-client relationship between the trial judge and the opposing counsel, the motion was correctly denied because the so-called "evidence" did not relate to the cause of the case. Bergeron v. Illinois Central Gulf Railroad Co., 402 So.2d 184, 186 (La.App. 1st Cir. 1981).
Moreover, to justify a new trial under Article 1972, the newly discovered evidence must not only relate to the cause of the case, it must also be "important" enough to potentially affect the outcome or change the result of the trial. See Miller v. Miller, 160 La. 936, 107 So. 702 (La. 1926). This court has held that to prevail on a motion for new trial under this prong of Article 1972, the movant must prove four elements: (1) that the new evidence was discovered after trial, (2) that the new evidence is not cumulative, (3) that the new evidence would tend to change the result of the case, and (4) that the new evidence could not have been discovered, with due diligence, before the trial was completed. Harris v. Orleans Parish School Bd., XXXX-XXXX, p. 4 (La.App. 4 Cir. 1/28/98), 706 So.2d 223, 225, citing Barker v. Rust Engineering Co., 428 So.2d 391, 394 (La.1983); Wright v. Hirsch, 572 So.2d 783, 791-92 (La.App. 4 Cir.1990). Because the conflict of interest allegedly harbored by Judge Medley at the time of trial does not meet this test, we find that the trial court did not abuse its discretion by declining to grant a new trial on peremptory grounds.
Alternatively, the plaintiff contends that the motion for new trial should have been granted on discretionary grounds, again arguing that the conflict of interest that Judge Medley admittedly had subsequent to the instant trial must also have existed during the trial, and its existence alone would constitute "good ground" for a new trial under Code of Civil Procedure Article 1973. We disagree.
Louisiana Code of Civil Procedure Article 154 provides:
A party desiring to recuse a judge of a district court shall file a written motion therefor assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment. If a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer the motion to another judge or a judge ad hoc, as provided in Articles 155 and 156, for a hearing.
One of the grounds for recusal recognized in the Code of Civil Procedure is when the trial judge "[I]s biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings." La. C.C.P. art. 151(B)(5). The plaintiff now contends that this ground for recusal existed during the trial of the instant case. Regardless of whether a valid ground existed, however, Article 154 does not apply to the instant situation because none of the parties made a motion to recuse Judge Medley prior to the rendering of the judgment. Moreover, the record reveals that the plaintiff's counsel clearly knew about "the facts constituting the grounds for recusation," i.e., the statement made concerning Judge Medley's alleged bias toward Mr. Harvey's firm, prior to trial.
On the morning of the first day of trial, the attorneys for each side met with Judge Medley in his chambers to resolve certain pretrial issues. According to the transcript of this conference, Mr. Robert Kerrigan, *760 counsel for the defendants, informed the court that he was aware that a representation had been made "on the public records" by a lawyer in another case to the effect that Mr. Harvey had said he had Judge Medley "in his hip pocket." Mr. Kerrigan then assured those present that he did not believe Mr. Harvey had made such a comment. Judge Medley explained that the representation had been made by another lawyer, whose motion to recuse Judge Medley was subsequently heard and denied by another judge. Judge Medley then stated "for the record" that he was not in anybody's hip pocket, and he considered the comment to be an insult. Mr. Harvey confirmed that he had never made any such statement concerning Judge Medley. Finally, Mr. John Glas, who (along with Mr. Kerrigan) represents Rick's Cabaret, reiterated that Rick's Cabaret had not filed a motion to recuse Judge Medley for any reason from the instant case. Judge Medley concluded the discussion by commenting that he nevertheless was glad Mr. Kerrigan had brought the matter up, because Judge Medley liked to have everything "on the table."
Despite having failed to assert a motion to recuse at that time, however, plaintiff now argues that Judge Medley had an ethical obligation to recuse himself under the Louisiana Code of Judicial Conduct. In support of this argument, plaintiff cites Disaster Restoration Drycleaning, L.L.C. v. Pellerin Laundry Machinery Sales Co., Inc., XXXX-XXXX (La.4/17/06), 927 So.2d 1094. The issue in that case was whether the trial court properly denied an attorney's motion to enroll as co-counsel on the basis that the attorney's enrollment would provide a ground for recusal of the trial judge. After extensive discussion, the Louisiana Supreme Court remanded the matter to be randomly allotted to another judge for an hearing on the motion to enroll. In so doing, the Court noted:
In a civil case, a judge's failure to self-recuse does not violate the Canons of the Code of Judicial Conduct; however, the judge's exercise of discretion is subject to legal review and resolution in accordance with the provisions of the Code of Civil Procedure.
XXXX-XXXX, at p. 10, 927 So.2d at 1100 (citing In re Judge Henry H Lemoine, Jr., 96-2116 (La.1/14/97), 686 So.2d 837, 840).
Upon review, to convince us that Judge Medley abused his discretion by failing to self-recuse, the plaintiff must show some objective evidence that Judge Medley knew at the outset or during the trial he had a conflict that would prevent him from being impartial. In addition, for us to overturn the denial of plaintiff's motion for new trial as an abuse of discretion, plaintiff must show that Judge Medley's failure to self-recuse affected the outcome of the trial.
To meet the first burden, plaintiff asserts that Judge Medley's own words written after the instant trial provide objective evidence that Judge Medley had a conflict of interest that also existed prior to the instant trial. Specifically, the plaintiff contends this court should infer from the per curiam and the written reasons that the circumstances which prompted Judge Medley to recuse himself in those instances should also have caused him to recuse himself from the trial of the instant case when the subject was brought to his attention in the pretrial conference in his chambers.
However, our reading of Judge Medley's words does not support such an inference. To the contrary, the per curiam and the reasons for judgment suggest just the opposite: that the circumstances which prompted Judge Medley's recusal on April 6 and subsequently may not have existed on March 21 when the pretrial conference *761 took place. Judge Medley emphasizes in the per curiam that the primary reason for his recusal is to avoid the appearance of impropriety due to "the impression conveyed by this [Mr. Klotz's] false statement in the minds of the public." Again in his May 18 reasons for judgment, Judge Medley explains that he is granting plaintiff's motion to recuse to avoid the appearance of impropriety, nevertheless averring: "To the extent that the motion suggest (sic) that the Court cannot be fair with petitioner or has an actual conflict of interest with petitioner, it is totally incorrect."
By contrasting these statements with Judge Medley's reaction on March 21 when the subject of the attorney's remark was brought to his attention on the morning of trial, it is obvious to this court that although Judge Medley was aware on March 21 that such a comment allegedly had been made, he did not then consider it to be a problem because, in his mind, there was no truth to the remark. Subsequently, however, the situation apparently escalated to a point at which Judge Medley believed the public perception created by the incident became significant in itself, regardless of the truth or falsity of the attorney's statement. Whether that point occurred before or after March 29, when the instant trial concluded, is impossible for anyone but Judge Medley to know. Nevertheless, we find no evidence in this record that Judge Medley believed at the commencement of or at any time during the trial of this case that he was unable to be fair and impartial toward all parties.
Moreover, even if the plaintiff were able to show that Judge Medley was harboring a secret conflict of interest with regard to her attorney, there is nothing in this record indicating that Judge Medley's alleged bias affected the outcome of trial. This matter was tried to a jury, and Judge Medley adopted the jury's verdict as the judgment of the court. The judge's role in conducting the trial was therefore limited to making evidentiary rulings and instructing the jury in the law. The plaintiff essentially argues that Judge Medley, in his zeal to avoid giving the impression that he was biased toward the plaintiff, made unfair evidentiary rulings in favor of Rick's Cabaret. Specifically, the plaintiff cites three instances in which Judge Medley excluded testimony or evidence offered by her.[8] Even assuming any of these rulings was legally incorrect, the plaintiff fails to show that their reversal likely would have affected the outcome of the trial.
Considering the record, we cannot say that the district court abused its discretion by denying plaintiff's motion for new trial on the issue of Judge Medley's failure to self-recuse prior to trying this case. We therefore decline to reverse that decision.
MOTION FOR NEW TRIALPOST-TRIAL AFFIDAVIT
The plaintiff also argues the trial court abused its discretion by denying plaintiff's motion for new trial based upon the post-trial affidavit of Amanda Galloway, a friend of plaintiff Kimberly Pyles and a co-worker at Rick's Cabaret. During the trial, Sherif Farag, a defense witness who was the night manager of Rick's Cabaret, testified that the club's security included a roving floor host with a radio, but that the floor host was not working on the night of Ms. Pyles's injury because the club was not very busy. Plaintiff's counsel claims to have been unfairly surprised by this testimony. After the trial, counsel obtained an affidavit from Ms. Galloway in *762 which she stated the Rick's Cabaret did not have a roving floor host. Plaintiff then moved for new trial on the basis that Ms. Galloway's affidavit constituted newly discovered evidence that mandated a new trial under Code of Civil Procedure Article 1972.
As we have previously noted, Louisiana courts apply a four-part test to determine whether the evidence asserted warrants a new trial under this prong of Article 1972. See Harris v. Orleans Parish School Bd., supra, 97-0724, p. 4, 706 So.2d at 225. One element of that test is that the evidence could not have been discovered with due diligence prior to the conclusion of the trial. The affidavit of Amanda Galloway does not meet this requirement. Nothing in Ms. Galloway's affidavit indicates she was unavailable for trial. Prior to trial Kimberly Pyles testified in her deposition that Amanda Galloway was one of her closest friends living in New Orleans. Thus, plaintiff's counsel cannot claim he was unaware of her existence. Nevertheless, even assuming he was surprised by Mr. Farag's testimony, plaintiff's counsel has made no showing that he attempted to call Ms. Galloway either as a direct or rebuttal witness. Absent such a showing, Ms. Galloway's affidavit does not qualify as new evidence that could not have been discovered by due diligence prior to the conclusion of the trial. For these reasons, we conclude the trial court did not abuse its discretion by declining to grant plaintiff's motion for new trial on the basis of this affidavit.
ISSUES ON APPEAL
Regarding the merits, appellant Rick's Cabaret asserts a single issue: the trial court erred by assigning any liability to Rick's Cabaret because the plaintiff failed to prove adequate security would have prevented the incident that caused her injuries.[9] Specifically, Rick's Cabaret argues that the trial court committed legal error by admitting the testimony of plaintiff's sole security expert, Larry Preston Williams, despite his lack of qualifications; alternatively, defendant contends that Mr. William's testimony was insufficient to prove that additional security would have deterred Anthony Weaver from throwing the glass.
In answer to the appeal, plaintiff not only refutes defendant's argument, but also asserts the trial court made several legal errors. Specifically, the plaintiff contends the trial court erred by refusing to admit the following evidence: (1) testimony by Mr. Farag that he heard Anthony Weaver say he was on parole; (2) testimony by Holly Malave that Anthony Weaver was allowed into Rick's Cabaret on two occasions after the glass-throwing incident; and (3) testimony by Holly Malave that after being questioned by the manager of Rick's Cabaret about the glass-throwing incident, Anthony Weaver tried to leave *763 the club through the side door before the police arrived. Plaintiff argues that if it were not for these evidentiary errors, the jury would have assigned a higher percentage of fault to Rick's Cabaret.

Evidence Presented at Trial
Fact witnesses presented on behalf of the plaintiff included Kimberly Pyles herself; Sherif Farag, who was the night manager of Rick's Cabaret on the evening in question; John Devries and Corey Ward (by deposition), who were door hosts at the club; and the video deposition of Holly Malave, the dancer who preceded Ms. Pyles on the stage that evening. The plaintiff also presented five experts on damages, including her treating physicians (a chiropractor, a neurosurgeon, a neuropsychologist, and a maxillofacial prosthodontist); and one security expert, Larry Preston Williams. The defense offered its own security expert, Dr. Wade Schindler, and its own expert in neurosurgery, Dr. Robert Applebaum. Two fact witnesses also testified on behalf of the defendants: Monique Malnado, the accounting manager for Rick's Cabaret; and Robert Watters, the owner of Rick's Cabaret.
Ms. Pyles testified she was an independent contractor who paid a fee to dance at Rick's Cabaret; therefore, she had no employee benefits. At the time of the incident, she was dancing on stage number two, also known as the piano stage, on the first floor. She testified that Rick's Cabaret had three floors; the first floor contained the main stage, the second or piano stage, three bars and a lobby. The second floor had a VIP room with its own bar, and the third floor contained the dressing rooms, offices and a general cashier for waitresses and entertainers. Ms. Pyles testified that Rick's Cabaret had no designated security personnel, but the manager (who moved around) and the VIP host (who was stationed at the bottom of the stairs leading to the VIP room) carried two-way radios. According to Ms. Pyles, other employees present that night included six waitresses, four bartenders, and two front doormen.
On the evening in question, after performing a two-song routine on the main stage, Ms. Pyles moved to the piano stage. As she approached the stage, the dancer who had preceded her, Holly Malave, warned Ms. Pyles that there was a table near the stage that was "rowdy." Ms. Pyles performed her routine, dancing topless as usual. Near the end of her second song, a man from the rowdy table, whom she later learned was Anthony Weaver, approached the stage with a dollar in his hand, offering it to her if she would expose more of her body. Ms. Pyles testified that she immediately knew there was a problem, because Mr. Weaver had an angry look, his pupils were dilated, and he was obviously intoxicated. She then cut off her routine before her relief arrived, left the stage, grabbed her clothes and put them on as she walked toward the place where the VIP host was stationed, intending to tell him what had happened. Ms. Pyles testified that she tried not to make eye contact with Mr. Weaver, but as she walked away she heard the others at his table laughing. Then, as Ms. Pyles was walking past the men's room, she was knocked unconscious by something that struck her in the face. Ms. Pyles stated she did not know how long she remained unconscious, but when she awoke she was lying on the ground with blood, glass and teeth in her mouth. Holly Malave, who was crouching over her, told Ms. Pyles that Mr. Weaver had thrown a glass at her. Holly and several waitresses helped her to the ladies room and told the manager, Sheriff Farag, to call the police. Ms. Pyles testified that when the policeman arrived, he did not question her, but that *764 she walked with him to the police station one block away and gave a report.
Ms. Pyles testified that the policy at Rick's Cabaret was for dancers not to attempt to deal with rowdy customers by themselves, but rather to alert a manager. On the night in question, she did not see a manager in the area where she was dancing. She stated that the piano stage area had only two tables of customers and a few people at the bar; the area was not full. She also testified that on account of the incident, she suffered numerous broken teeth and exposed nerves, requiring four years of specialized dental treatment. She stated that Mr. Watters, the owner of Rick's Cabaret, met with her shortly after the incident and offered to pay for her dental work, and that he had paid those bills. However, she also had neck pain, for which she saw a neurologist and wore a neck brace for three weeks. In addition, she suffered memory loss that she attributes to the incident. Because of mobility restrictions due to her neck injury, Ms. Pyles was advised by her neurologist not to return to her former job as an exotic dancer. She testified that in December 2003, she graduated from the John Jay beauty college and was making her living as a cosmetologist at the time of trial.
On cross-examination, Ms. Pyles admitted she continued to dance at Rick's Cabaret part-time (from four to seventeen nights per month) from about one month after the incident until April, 2004. She also acknowledged that she was issued a citation by the police for public disturbance by fighting based on the incident,[10] and that she drove herself home that night. She did not go to the emergency room until the next afternoon, approximately fifteen hours after the incident.
Sheriff Farag, the night manager at Rick's Cabaret, testified that the entire staff provided security at the club. There was no specific security training, but there were monthly staff meetings during which all aspects of running the club were covered. The employees were instructed to call the manager, who was primarily responsible for security, whenever there was a problem. There were two front door hosts, who decided whether a patron was too intoxicated to allow into the club. Signs of this level of intoxication included stumbling, aggressiveness, and being rude or demanding. If the door hosts were uncertain about whether to admit someone, they were to call the manager to make that decision. Mr. Farag identified the policy manual given to employees of Rick's Cabaret, which stated that employees had a duty to warn management of any suspicious activities, such as threats or aggressive behavior by a customer. Mr. Farag had heard of only one prior incident in which a customer, a football player, had hurt an entertainer, but he had not been working that night.
At the time of the incident, Mr. Farag was not in the stage two area. He testified that he was either in the lobby at the front door or on the third floor at the cashier. He stated that he had a two-way radio, as did the two front door hosts, the VIP host, the Dee-jay, the front desk cashier and the third floor cashier; there was also a radio behind each bar. He stated that there were also security cameras, but they were pointed at the cashiers and the bars. Mr. Farag testified that normally on busy nights, there would also be a roving floor host with a radio, but there was not *765 one present that evening, presumably because the club was not crowded.
On the night in question, Mr. Farag received a call on his radio about the incident and he went to the location. When he got there, one of the doormen was with Mr. Weaver, and the VIP host was with Ms. Pyles. Ms. Pyles told him the customer had hit her with a glass. He did not know Ms. Pyles had been unconscious. Ms. Pyles appeared to be shaken up, but he observed no blood on her. She pulled down her lip, and he noticed her bottom teeth were not straight, but were at an angle. Mr. Weaver stated that Ms. Pyles had thrown a drink at him and pointed to his wet T-shirt. Mr. Farag determined that there were only two eyewitnesses to the incident: another entertainer (presumably Holly Malave), who confirmed that Mr. Weaver had thrown a glass at Ms. Pyles; and one of Mr. Weaver's friends, who confirmed Mr. Weaver's story. Mr. Farag could not tell whether either Ms. Pyles or Mr. Weaver was intoxicated. However, when he took Mr. Weaver aside to talk to with him, Mr. Weaver did not smell of alcohol, nor was he disoriented, wobbly, or talking with slurred speech; he merely seemed nervous. Mr. Farag called the police, but did not fill out an incident report, which he testified was "his mistake."
John Devries, a front door host who was not working on the night in question, testified that the employees had no security function. Security was the manager's job, but the employees, although they were not trained to watch for problems, did have the responsibility to help out if something happened. Mr. Devries stated that although the front door hosts were only a few feet from the entertainers, the door hosts were not facing inside the club; their primary job was to check the I.D.'s of those entering. Finally, Mr. Devries confirmed that there were monthly staff meetings, at which the Rick's Cabaret employees were trained in dispute resolution.
The deposition testimony of Corey Ward, one of the front door hosts on duty on the night in question, was introduced as evidence. Mr. Ward testified that he did not see the incident. He also did not specifically recall Anthony Weaver having entered the club. Mr. Ward was called on his radio after the incident occurred. When he arrived at the scene, Ms. Pyles appeared upset but she did not appear to be bruised or cut. He could not tell whether either she or Mr. Weaver was intoxicated. Finally, Mr. Ward testified that this occurrence was the type of thing that would normally require the manager to write an incident report.
Plaintiff also introduced the videotaped deposition of Holly Malave, Ms. Pyles' good friend, who worked as a dancer at Rick's Cabaret from 1997 until 2000. She testified that on the night in question, she performed her two-song routine on stage two just before Ms. Pyles' routine. During her six-minutes on stage, Ms. Malave noticed Mr. Weaver sitting at the front table drinking with his friends. According to Ms. Malave, Mr. Weaver was getting loud and obnoxious, making lewd comments to her and other dancers who walked by. Ms. Malave testified that Mr. Weaver did not seem like most of the club's clients, who were businessmen or tourists; he seemed to be the "thug" type. According to Ms. Malave, Mr. Weaver appeared to be extremely intoxicated that night. After her routine was over, Ms. Malave went to the restroom; then she returned to the stage two area and stood in front of the men's restroom watching Ms. Pyles perform. Mr. Weaver had a dollar in his hand, and kept standing up talking loudly to Ms. Pyles and apparently trying to tip her, but she would not *766 take the dollar. Ms. Malave did not tell anyone else at the club about Mr. Weaver's behavior. She did not see the manager in the area where she was. Ms. Malave then saw Ms. Pyles leave the stage, and as Ms. Pyles turned to go around to the main room, Mr. Weaver threw a water glass at her from about three to four feet away; the glass hit her on the side of her head and she fell down to the ground. Ms. Malave and several other employees went over to help Ms. Pyles up. Ms. Malave then took Ms. Pyles, whom she described as "disoriented," to the ladies restroom because she had blood and teeth chips in her mouth. When Ms. Malave returned to the floor, the manager, Mr. Farag, was questioning Mr. Weaver in the side hall. The police showed up about thirty minutes later and took Mr. Weaver to the police station. Ms. Malave did not talk to the police, but she assumed Mr. Farag had called them. Ms. Malave testified that there was no physical interaction between Mr. Weaver and Ms. Pyles prior to the glass being thrown, only talking. Ms. Malave also stated that she had seen Mr. Weaver at Rick's Cabaret at least twice before that night. During her four years working at Rick's Cabaret, Ms. Malave had seen fights break out among customers and also fights between dancers and customers. Once a drunk customer had pushed a dancer off the stage. Ms. Malave stated that after her injury, Ms. Pyles only worked half as much at Rick's Cabaret as she had before, could not dance as well, and exhibited some noticeable memory loss.
Plaintiff's final witness on liability was security expert Larry Preston Williams,[11] who opined that the failure of Rick's Cabaret to provide adequate security contributed to Ms. Pyles' injury.[12]
The defendant's primary witness on liability was security expert Dr. Wade Schindler.[13] To form his opinion, Dr. Schindler reviewed depositions; visited Rick's Cabaret, looked at a floor plan of the club as it was in February, 2001[14]; examined police records and reports showing approximately four hundred instances in which police were called to Rick's Cabaret in the three years prior to this incident; interviewed Mr. Sherif; considered the nature of the club and its customers; and considered the the number of employees, as well as their training. Based upon these factors, Dr. Schindler opined that there was adequate security at Rick's Cabaret on the night of the incident, that the incident was not foreseeable by any of the employees of Rick's Cabaret, and that providing additional security would not have prevented Mr. Weaver from throwing the glass at Ms. Pyles.
The remaining witnesses for the defendants included the accounting manager of Rick's Cabaret, who authenticated Ms. Pyles' work records both before and after the incident, and the owner of Rick's Cabaret, Mr. Robert Watters.[15] Mr. Watters testified that his efforts to make Rick's *767 Cabaret a safe environment for the employees, dancers and customers included: the design of the club; the imposition of a cover charge; the lack of a "barker"; intense scrutiny at the front door to prevent overly intoxicated people from entering the club; deliberately high-priced drinks; and the hiring of non-industry people as managers (as opposed to bouncers or other persons aggressively trained in security). He testified that employees are taught to handle altercations by first separating the individuals involved and then diffusing the situation by speaking to each individual in a particular way. Entertainers are instructed not to try to resolve disputes themselves, but to go and find a manager instead. Mr. Watters further testified that at the time of the incident, there were approximately seventy employees and entertainers on the premises of Rick's Cabaret. Other than the incident with Ms. Pyles, Mr. Watters was aware of only one other occasion in which an entertainer was injured by a patron of the club; that incident occurred in 1998 and involved a professional football player. Mr. Waters stated that the afternoon after Ms. Pyles was injured, he was in his office at the club when he got a call that Ms. Pyles was downstairs. He went downstairs to meet with her. She related to him that she had been involved in a verbal exchange with a customer, who had struck her with a bottle. When asked, Ms. Pyles told Mr. Watters that she could not afford to have her teeth repaired; she also showed him the subpoena she had received for public fighting. Mr. Watters testified that he told Ms. Pyles she should get her teeth fixed and he would pay for it; he also told her she should get a restraining order and file suit against Mr. Weaver, and finally he gave her the name of a criminal attorney whom he advised her to hire to take care of the subpoena for her. When Ms. Pyles asked him about her pain and suffering, Mr. Watters told her he did not believe Rick's Cabaret was responsible for her injury, but that Mr. Weaver was responsible.

Assignment of Fault to Rick's Cabaret
The jury assigned 20% fault to Rick's Cabaret based upon negligence and 80% to Anthony Weaver, the intentional tortfeasor. The only possible basis for the jury to find fault on the part of Rick's Cabaret is the failure of Rick's Cabaret to provide adequate security for its dancers. In order to show there was a lack of security at the club, plaintiff presented the testimony of Larry Preston Williams, who was accepted as an expert in security. Rick's Cabaret first contends that Mr. Williams should not have been qualified as an expert under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Alternatively, defendant argues that plaintiff failed to prove the lack of adequate security noted by Mr. Williams caused Ms. Pyles' injury because the evidence did not show that additional reasonable security measures would have prevented Mr. Weaver from throwing the glass.
The requirements of expert testimony are set forth in La. C.E. art. 702, which provides:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.
See Mistich v. Volkswagon of Germany, 95-0939, p. 8 (La.1/29/96), 666 So.2d 1073, 1079. Formal education or training in a particular field is not always necessary to qualify as an expert in a particular field; experience alone is sufficient. Id. (citations omitted). It is well-established that *768 the trial judge has wide discretion in determining whether to allow a witness to testify as a expert, and his judgment will not be disturbed by an appellate court unless clearly erroneous. Id.; Johnson v. Melton, 03-1132, pp. 5-6 (La.App. 4 Cir. 2/4/04), 867 So.2d 804, 808. The U.S. Supreme Court in Daubert suggested the following factors in evaluating scientific expert testimony: (1) the testability of the expert's theory or technique; (2) whether the theory or technique had been subject to peer review and publication; (3) the known potential rate of error; and (4) whether the methodology was generally accepted by the scientific community. 509 U.S. at 592-94, 113 S.Ct. at 2796-97. However, the Daubert factors are meant to be helpful, not definitive. Johnson v. Melton, supra, citing Kumho Tire Co., LTD. V. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). The Kumho Court explained the purpose of Daubert as follows:
The objective of Daubert's gatekeeping function is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. We conclude that the trial court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. The trial court must have the same kind of latitude in deciding how to test an expert's reliability. . . . Our opinion in [Daubert] makes clear that a court of appeals is to apply an abuse of discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad discretion.
Johnson v. Melton, supra, p. 6, 867 So.2d at 808 (quoting Kumho, supra, 526 U.S. at 152-53, 119 S.Ct. at 1176).
In the instant case, Mr. Williams testified that he had been self-employed as a security consultant since 1993 and as an investigative consultant since 1986. He received a Bachelor's Degree in Criminology from Loyola University in 1971. From 1968 until 1974, Mr. Williams worked in the Intelligence Division of the New Orleans Police Department, and from 1974 until 1977 he worked as a Special Investigator for the District Attorney's office. Having received a Juris Doctorate from Loyola in 1976, Mr. Williams practiced law from 1977 until 1985. He admitted he stopped practicing law when the Louisiana Supreme Court first suspended, then revoked, his license for multiple instances of misconduct, including converting client funds to his own personal use. Mr. Williams testified that he had published an article on protecting tourists and another on protecting rural churches from fire-bombs; that he had been appointed in 1998 to a Louisiana Department of Education task force on school violence; and that he had lectured on preventing violence in schools. He also testified that he had been accepted as an expert in a Plaquemines Parish court and in a Florida court, but admitted that he had never testified as an expert on security as it applies to a gentlemen's club, night club, or other establishment that serves alcohol. He also admitted he had never designed or analyzed security for such an establishment. He testified he was not a certified protection professional, nor did he belong to any organization of security professionals. *769 The trial judge accepted Mr. Williams as an expert in security based upon his "extensive experience in law enforcement and security-related issues."
Although Mr. Williams lacked the level of expertise possessed by the defendants' expert, Dr. Schindler, we cannot say the trial court abused its discretion by allowing him to testify as an expert on security. The fact that he was disbarred for misconduct as a lawyer, while it may relate to his credibility, has no bearing upon Mr. Williams's expertise in security-related issues. His degree in Criminology and experience as a police officer and special investigator provide at least the minimum credentials necessary to qualify him as an expert capable of giving an opinion as to the effectiveness of the security at Rick's Cabaret. It is well settled that the trier of fact is charged with the determination of what credibility it assigns to expert witnesses and the decision as to which expert among those testifying is more credible. Hayes v. Entergy Corp., 37,190, p. 7 (La.App. 2 Cir. 6/25/03), 850 So.2d 916, 921, citing Lasyone v. Kansas City Southern R.R., 00-2628 (La.4/3/01), 786 So.2d 682. In the instant case it was not error for the trial judge to afford the jury the opportunity to hear both experts, to assess their credibility, and to determine what weight it should place on the opinion of each.
Defendants next argue that the plaintiff failed to prove causation; in other words, they argue that even with Mr. Williams' testimony, there was insufficient evidence to show that had Rick's Cabaret implemented adequate security, the glass-throwing incident could have been prevented. Mr. Williams based his opinion upon his reading of the witnesses' depositions, as well as his review of: the New Orleans Police Department records of calls to Rick's Cabaret between January 1, 1998 and December 30, 2001; the employee handbook of Rick's Cabaret; a reference book entitled The Night Club, Bar, and Restaurant Security Handbook; and a Minnesota study on harassment and abuse of exotic dancers. He did not physically inspect Rick's Cabaret, nor did he go to any other similar clubs on Bourbon Street because he believed the level of security at those clubs was irrelevant. Mr. Williams opined that an employee of Rick's Cabaret should have removed Mr. Weaver from the scene before he picked up the glass and threw it. He testified that there were several security measures Rick's Cabaret could have taken that would have deterred Mr. Weaver's behavior. Those measures included having surveillance cameras pointed at the patrons; using trained security personnel and posting identifiable security (such as men wearing t-shirts or uniforms that identified them as security) at various positions inside the club; posting signs or making announcements concerning security; having a security awareness program for dancers; and finally, replacing the heavy glass drinking cups with lighter plastic ones. On cross-examination, Mr. Williams admitted that besides the drinking glasses, there were many other heavy objects in the club that could serve as missiles, such as ashtrays and beer bottles. He also admitted that a sign probably would not have deterred an intoxicated person from engaging in violent behavior. Finally, he confirmed that he had not submitted a written expert report in this case.
Defendants contend that Mr. Williams' testimony failed to prove that any of the measures he recommended would have prevented Mr. Weaver from throwing the glass. Moreover, they argue that Mr. Williams made no attempt to show that Rick's Cabaret had a legal duty to implement any of the security measures he recommended. *770 In further support of their argument that the incident was not preventable, defendants cite Ms. Pyles's own testimony on cross-examination, during which she confirmed the allegation in her petition that Mr. Weaver threw the glass at her "without warning." Finally, defendants cite Dr. Schindler's opinion that, based upon Ms. Pyles's testimony, there was no reason for any employee of Rick's Cabaret to suspect that Mr. Weaver intended to injure Ms. Pyles before he actually picked up the glass and threw it.
The allocation of fault is a factual determination that cannot be overturned on appeal unless it is clearly wrong or manifestly erroneous. Medice v. Delchamps, Inc., 96-1868 (La.App. 4 Cir. 4/30/97), 694 So.2d 528, 530; Declouet v. Orleans Parish School Bd., 96-2805, p. 11 (La.App. 4 Cir. 6/3/98), 715 So.2d 69, 76. The jury's apportionment of fault is subject to the same analysis on appeal as that applied to its finding of general damages, and will not be set aside absent abuse of the trier of fact's great, even vast discretion. Lederer v. Famous Entertainment, Inc., 98-2274, p. 18 (La.App. 4 Cir. 5/12/99), 732 So.2d 1277, 1286,. If the appellate court finds a clearly wrong apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Sciambra v. Jerome Imports, Inc., 05-0260, p. 15 (La. App. 4 Cir. 12/14/05), 921 So.2d 145, 154. In apportioning fault, the trier of fact must consider both the nature of the conduct of each party at fault and the extent of the causal relationship between the conduct and the damages claimed. Sagona v. Harris, 97-0129 (La.App. 4 Cir. 6/18/97), 696 So.2d 595; Grant v. Allstate Ins. Co., 96-1028 (La.App. 3 Cir. 6/4/97), 696 So.2d 275.
In the instant case, we do not find the jury's allocation of 20% fault to Rick's Cabaret to be unreasonable based on the totality of the evidence. By this allocation of fault, the jury recognized that Mr. Weaver himself was primarily responsible for the plaintiff's injuries, but the fault of Rick's Cabaret was nevertheless a contributing factor. The plaintiff and Ms. Malave testified that the patrons at Mr. Weaver's table were rowdy, and that Mr. Weaver's behavior was loud and obnoxious during both their routines, which encompassed a twelve-minute period. Ms. Pyles also stated that Mr. Weaver was clearly intoxicated, and Ms. Malave testified he was not behaving like a typical club patron. Ms. Pyles further testified that because of Mr. Weaver's behavior, she left the stage before her relief had arrived, which was a violation of the rules, and as such presumably would have been noticed as unusual behavior by a manager or other employee of Rick's Cabaret. Although the managers were primarily responsible for security at the club, all witnesses agreed that there was not a manager in the area of stage two at the time of the incident. Under the circumstances, the jury could have reasonably found that an employee of Rick's Cabaret should have noticed the problem and should have taken some action to calm down or remove Mr. Weaver from the area, which may have prevented the incident. We therefore decline to disturb the allocation of fault determined by the jury.
Evidentiary Issues
On appeal, the plaintiff contends the trial court committed legal error by improperly excluding evidence supporting her claim. The excluded items, which were proffered by plaintiff, include: (1) Mr. Farag's testimony that when he took Mr. Weaver aside to question him after the incident, Mr. Weaver told him he was on parole; (2) Ms. Malave's testimony that she saw Mr. Weaver at Rick's Cabaret on two occasions after the glass-throwing incident had occurred; (3) Testimony that Mr. *771 Weaver tried to leave the club through the side door before the police arrived.
We first note that the record does not support the plaintiff's contention that evidence concerning Mr. Weaver's attempt to leave by the side door was excluded. Ms. Malave testified that she observed him trying to leave but that he was not allowed to do so. Regarding the other two items that were excluded, we find no reversible error on the part of the trial court. The trial court correctly determined that Mr. Weaver's statement that he was on parole should be excluded as hearsay. Moreover, even if the statement had been admitted, it has no bearing upon the fault of Rick's Cabaret. Moreover, the statement would have had no probative value in light of the fact that the defendants proffered court records showing Mr. Weaver was not on parole on February 8, 2001, which records would have presumably been admitted had the trial court allowed the statement to come in. Regarding the other excluded item, Ms. Malave's testimony showing Mr. Weaver was allowed back into the club on two occasions after the incident had occurred, we agree with the trial court that such evidence is not relevant to the determination of whether Rick's Cabaret had adequate security on the night of the incident; we further agree that the prejudicial effect of introducing such testimony would have outweighed its probative value.
Accordingly, we conclude that the trial court did not commit reversible legal error in this case.
CONCLUSION
For the reasons stated, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Anthony Weaver died on April 16, 2003, and his estate, through the succession representative, was substituted as a defendant in July, 2003.
[2] The plaintiff's first motion for new trial asserted that the award of $50,000.00 for past medical expenses was contrary to the evidence, which showed actual past medical expenses in the amount of $50,893.96. In a separate motion, the plaintiff asserted that a new trial was warranted by newly discovered evidence, namely the affidavit of Amanda Galloway, another dancer at Rick's Cabaret. The motion for new trial by Rick's Cabaret was based upon three grounds: (1) The judgment should be amended to clarify that Rick's Cabaret was not solidarily liable with Anthony Weaver for the entire amount of damages awarded; (2) The judgment failed to identify the amount of expert fees awarded; and (3) The judgment improperly contained the names of the jurors.
[3] By this motion, the plaintiff sought to have the fault reallocated so that Rick's Cabaret would be liable for 60% rather than 20% of the damages.
[4] Regarding that recusal, the trial judge issued a per curiam on April 14, 2005, pursuant to this court's consideration of a writ application on the matter. The trial judge explained that a conflict of interest had developed between himself and Mr. Harvey and his associate, Mr. Patrick Klotz, after Mr. Klotz had allegedly made a comment to his client, a party in yet a third case, which comment the client had secretly tape-recorded; the gist of the comment was that the client did not have to worry about the outcome of her case because "we [presumably Mr. Klotz and his associates] have Judge Medley in our pocket." While denying that there was any truth to Mr. Klotz's statement, the trial judge nevertheless believed it created a conflict that warranted his recusal to avoid the appearance of impropriety.
[5] In written reasons for judgment, the trial court stated that he did not have an actual conflict of interest with plaintiff's counsel, but because of the freshness of Mr. Klotz's statement, the trial judge believed he should recuse himself to avoid the appearance of impropriety.
[6] The trial court had already amended the judgment to delete the jurors' names.
[7] See note 4 supra.
[8] Because the same rulings are the basis of the plaintiff's alternative argument that the allocation of fault should be adjusted on appeal, we address the propriety of those rulings infra in our discussion of the merits.
[9] Defendant also argues that the trial court's judgment should not be interpreted to mean that Rick's Cabaret and Anthony Weaver are solidarily liable, thereby exposing Rick's Cabaret to liability for the entire amount of damages. However, the law is clear that at the time of this incident, comparative fault applied in Louisiana, under which the fault of a negligent tortfeasor is to be compared with that of an intentional tortfeasor in just the same way as the fault of multiple negligent tortfeasors would be compared, with each tortfeasor liable in proportion to his own percentage of fault. See La. C.C. arts. 2323, 2324; Dumas v. State, 02-0563 (La.10/15/02), 828 So.2d 530, 537. We find no ambiguity in the trial court's judgment nor any potential for interpreting its language as providing for solidary liability rather than for comparative fault. Therefore, despite plaintiff's continued attempts to revive this issue (such as by objecting to the amount of the appeal bond filed by Rick's Cabaret), we reiterate that Rick's Cabaret is not liable for more than 20%, or $90,000, of the $450,000 total damages awarded.
[10] The evidence showed that Mr. Weaver was also issued a citation for public disturbance by fighting.
[11] The evidence regarding damages is omitted from our discussion because quantum is not at issue in this appeal.
[12] Mr. Williams' testimony is discussed in detail in our discussion, infra, addressing the assignment of fault to Rick's Cabaret.
[13] Dr. Schindler was qualified as an expert following a pretrial Daubert hearing, and his qualification is not at issue on appeal.
[14] The evidence showed that at the time of Dr. Schindler's visit, there had been some modifications to the floor plan made since the incident.
[15] Defendants also presented expert physician testimony to refute the plaintiff's experts regarding damages. See note 11 supra.