MARION F. EDWARDS, Judge.
The defendant/appellant, Lafayette Insurance Company (“Lafayette”), appeals a jury verdict in favor of the plaintiff/appellee, Harvey Canal Limited Partnership (“HCLP”), in the amount of $3,640,000 as actual damages plus $5,000 in penalties. HCLP is the owner of a large commercial warehouse on Airline Drive in Kenner, *622 Louisiana. Lafayette insured the premises by a policy issued on November 1, 2004 and extended through November 1, 2005. Due to the landfall of Hurricane Katrina on August 29, 2005, the warehouse was damaged. On August 26, 2006, HCLP filed suit against Lafayette, alleging that Lafayette’s tender of $467,218.88 was grossly insufficient to cover the losses sustained. HCLP averred the premises, specifically the building’s roof, suffered damages in the amount of $2,795,075 and that Lafayette had denied its claim. HCLP urged that Lafayette was in bad faith and that its failure to pay was arbitrary and capricious and requested damages as well as penalties and attorney’s fees.
A jury trial was held in February 2009, following which the jury returned a verdict in favor of HCLP and against Lafayette in the amount of $3,640,000 as actual damages plus $5,000 in penalties. The verdict was made a judgment of the trial court. From this judgment, Lafayette has appealed.
hRay Fuenzalida, general manager of HCLP, testified that the property is a “high cube distribution facility” leased to one tenant, Crossroads Centers, for public warehousing. “High cube” means the building is high to accommodate racks of shelving for storage. The building footprint is 230,325 square feet, with the roof being about 232,000 square feet. It is 1,450 feet long on one side and 1,325 feet on the other — about twice as long as One Shell Square is tall. There are five firewalls in the building so that the sections are referred to as buildings one through five. The building is a food-grade facility, meaning it is FDA certified and must meet higher standards than most for cleanliness. The tenant of the building stored food products. In 2002, the roof required repairs in the amount of $1,600 to repair leaks. In 2003, there were no reported leaks. Through April of 2004, $2,350 was spent for roof repair. In April of that year, a hailstorm occurred and leaks began to appear in building five. It was determined that the roof, which consists of 20-gauge aluminum panels, was dented but not damaged, and HCLP applied an elas-tomeric coating, a rubberized top coat which is a common repair for metal roofs. Those repairs cost $55,000. There were no further leaks until Hurricane Katrina.
Due to that hurricane, a number of roof panels were blown off. Most of the damage was in the northeast, northwest, and southwest corners. There were many dents, cuts, and holes in the roof as well. The four firewalls became detached, and one had to be replaced completely. There was damage to the sprinkler system. Mr. Fuenzalida told Mr. Hugh Sparks, the Lafayette adjuster, that he thought a new roof was needed. Mr. Sparks told him to patch the roof. HCLP was able to obtain some roofing materials to make some emergency repairs, but those materials were not aluminum as was the original roof. Mr. Sparks’ report allocated $296,000 for roof repair at that time. The amount of $2,500 was allocated for gutter | replacement but cost HCLP $20,930. Since the emergency repairs, there are numerous leaks.
HCLP hired Guardian Roofing Systems to make repairs immediately after Hurricane Katrina. Robert Lewis of Guardian testified that, after that event, the company had to make repairs about once a month. The Bayer coating system would address all the leaks in the building but does not supply structural support. However, he would defer to the architect as to a decision on the necessity of a new roof.
Murray Architects (“Murray”) was hired to evaluate the roof damage. Murray determined that a new roof was needed and would cost approximately $2.8 million. *623 Other companies have estimated the new roof to cost over three million dollars. After receiving Murray’s report, Lafayette sent Haag Engineering Company (“Haag”) to check the roof. A report received from the independent adjuster hired by Lafayette, Property Loss Consulting (“PLC”), estimated damages to the roof in the amount of $467,218.88.
In 2008, Hurricane Gustav caused more damage to the property, even more than Katrina. Most of the damage from that storm was in the area of building five. Mr. Fuenzalida testified that, in his estimation, if a milder storm such as Gustav could damage twice as much square footage as Hurricane Katrina, then Katrina weakened the property to the point where it was no longer a viable roof. HCLP received $817,000 for repairs after Gustav.
Paul Murray, Jr. testified on behalf of Murray. Mr. Murray himself is not an architect but is a licensed, general contractor for building construction. He has designed approximately ten buildings with metal roofs similar to. the one in question but has been involved in every inspection the firm has done. He initially inspected the roof with an intern architect and took photos for his report. They | ^walked on the roof and found there was catastrophic damage in three corners of the building. Near the metal fasteners at the points of attachment, the roof had moved many times weakening it. From inside the building, light came through at every area where the roof had become unstable. One firewall had moved and needed repair while another was in danger of falling. Because there were dry goods stored inside that were not waterproof, a watertight covering was needed immediately.
Paul Murray, Sr. was qualified as an expert in architecture. He testified that movement of the metal panels in the roof against the rivets caused a weakening of the roof panels. The holes where the roof fasteners are inserted were stretched due to the roof movement. He recommended a new roof because a subsequent storm, such as Hurricane Gustav, would cause more damage. The estimate for a new roof given in 2005 would be increased in the current market at three-and-a half to four million dollars. Mr. Murray had not himself inspected the property.
Ronald Maines works for Crossroads Centers (“CRG”), a transportation and warehousing company and the tenants of HCLP. After the hailstorm, the roof continued to perform well once the elastomeric coating was used. After Hurricane Katrina, Mr. Maines told Mr. Fuenzalida about the problems with the roof. There were leaks all over the building. After a tarp was put on the roof, a lot of moisture still got in. Still, after patch work was done, they continued to chase leaks and are still doing so. There are leaks after any rain. After Gustav, huge sections of the roof were in the parking lot. If the roof is not replaced, CRC would have to find another building.
Kelly Spence, a construction consultant for a public adjusting firm, was qualified as an expert in the field of "public adjusting. He inspected the property in 2008. He walked the roof in the building and found debris hit impact marks, dimpling, and uplift throughout the roof. The stretching of the holes where the | fasteners were inserted was damage, rather than wear and tear. After Gustav, Mr. Spence again inspected the property and found that roof material had peeled away. According to the Lafayette policy, if the roof is damaged to the extent of not being repairable, the insured is entitled to a replacement roof. With a replacement-cost policy, the insurer is not entitled to subtract depreciation. With cash-replacement value, the insurer must pay the cash *624 value of the roof until it is actually replaced. HCLP was paid for the repairs minus depreciation. Mr. Spence reviewed the report generated by Lafayette’s adjuster. That report did not include any amounts for an electrician, supervision, taxes, insurance, fees, permits, or debris removal, all of which should be included in a scope report. It did not include the canopy roof over the loading dock. It did not include an amount for broken lights, and it did not include a sufficient sum to repair all the gutters.
The siding on the exterior walls of the building was damaged and could not be refinished because of corrosion. Most of the replacement costs of the walls were not included in Lafayette’s report. While Mr. Spence agreed with the square footage allowed by Lafayette for drywall, the price quoted was for drywall not thick enough to be up to code. Several other items, which Mr. Spence deemed necessary, were not allowed by the insurer. Mr. Spence estimated that HCLP was entitled to $8,147,515.41. Although it had been a couple of years since Hurricane Katrina, based on his experience, he felt the damage was done around that time, but he could not be 100 percent certain.
Stephen Braquet was qualified as an expert architect. He also examined the building in 2008. The HCLP building is framed with a steel frame. The roof is a structural panel roof, or part of the structural component of the building, keeping all the building components tightly tied together. The integrity of the roof is essential to the integrity of the building. During Hurricane Katrina, the pressure 17built up inside the building and blew the roof out. When the building was being pressurized, the fasteners were holding tight to the joist and, finally, the wind blew out on the corners. As a result, the area at the fasteners was left deformed, and the holes around the rivets were loosened as well when the metal stretched. Mr. Bra-quet used a construction flat bar to push up the roof at certain points in order to check for any leeway and found the fasteners were loose. The roof is now sitting on just a small part of the surface area rather than on most of the surface and is loose. In his report, Mr. Braquet found that the pressurization created a depressed area at the fastener points and those “dimples” invite water to the fasteners as well as hold water beyond the end of a water event. The fasteners are not the failure point, but the metal roof was stretched beyond those fasteners. The hurricane wind worked on the main frame of the building and cannot stand the 90-miles-per-hour wind that it was designed to withstand. HCLP could replace the fasteners, but the roof would not meet the integrity of the roof that was there before Katrina. The roof, designed in 1976, would still have been able to meet the 90-miles-per-hour requirement, provided there were no catastrophic failures. In Mr. Braquet’s opinion, the roof is dangerous, and the building needs a new roof. He estimated the cost at $3,700,816.
Robert Fleishmann, a mechanical engineer, employed by Haag, testified as an expert in the field of mechanical engineering with a specialty in roofs. Haag is an engineering company that specializes in failure and damage consulting. Mr. Fleishmann inspected the HCLP roof in May 2004 in order to evaluate damage from the April hailstorm. There had been some leaks in the roof since HCLP purchased the building. Some rivets appeared to have electric corrosion, caused by galvanic action between different types of metal. Some of the gaskets appeared to be worn. Temperature changes cause the metal panels to expand and contract. It | ^looked as though sealant had been placed around one of the fasteners, and several *625 similar repairs had been made in two areas. There were other alterations on the roof and other mechanical damage that could result in leakage. He observed that hundreds of repairs had been made on the roof. The quality of the rivets and panels was better than usual. The roof was twenty-five years old and showed its age, and it was in fair to poor condition. The aluminum panel was thick, but the ceiling system had deteriorated, and it was obvious that it was failing. Mr. Fleishmann found no damage to the roof caused by the recent hail storm, although he found denting. The hail dent did not cause functional loss of the metal roof. He did not find evidence of any structural damage at that time. At the time of his inspection, he believed the roof had at least twenty years left in its life. The only catastrophic events that occurred since then were Hurricanes Katrina and Gustav.
Patrick Challenger testified as a claims supervisor at Lafayette. The company had not insured HCLP for a couple of years and had not received a claim regarding damage from Hurricane Gustav. The Katrina claim was submitted by HCLP’s insurance agent in October 2005. In November, Mr. Challenger was contacted by Mr. Sparks, who informed him that reports from an engineer and architect stated that the entire roof, including gutters, framing, and interior needed to be replaced at a cost of $2,800,000. Lafayette received a copy of Murray’s report in November. Mr. Challenger instructed Mr. Sparks to contact Haag. In a subsequent report, Mr. Sparks estimated the cost to repair the roof, minus the $10,000 deductible, was $467,218.88. The costs were later broken down to factor in depreciation and actual cash value. The replacement cost provision will pay the actual cost to repair or replace, but, until the repairs are completed, the cash value, $878,612.04, was the only amount due up front.
UHaag’s report, written by Ralph Jenner, indicated that, although there had been some wind damage, there was evidence of deterioration that was related to wear and tear rather than to the hurricane. Mr. Sparks agreed with this report. Lafayette also had a copy of Mr. Fleish-mann’s report of prior deterioration.
Because there was potential for a substantial amount of difference, Lafayette paid the entire estimate of $467,218.88 in December 2005, within thirty days of the receipt of the estimate. Lafayette did not receive Mr. Spence’s report until a week prior to trial. Mr. Challenger testified that, if the roof needed replacing, it was due to wear and tear and corrosion, not because of damage sustained during Hurricane Katrina.
Ralph Jenner was qualified as an expert in the field of structural engineering. On his initial inspection in January 2006, he noticed thousands of repairs had been made earlier. Fasteners and seams had been recoated more than once. Mr. Fuenzalida had informed him previously there had been severe leakage problems in building five and that that section of the roof had been recoated. Mr. Fuenzalida also told him that Hurricane Katrina had blown off the roof at three corners; that several panels had been loosened, blown up and bent; and that the building was now leaking everywhere. Mr. Jenner observed that Katrina had blown off roof panels in the northeast, northwest, and southwest corners. This accounted for about one percent of the total roof in square footage. There were also bent panels damaged by flying debris. He saw no evidence that any fasteners had been loosened. There were no uplifted panels. A second inspection was made in February. Mr. Jenner conducted a leak test on 3,700 square feet of the 280,000 square *626 foot roof. While a technician sprayed water on the roof, Mr. Jenner inspected the inside, looking for leaks and turning the rivets. When it began to Imrain, Mr. Jenner walked through buildings four and five and found only one leak that came through a rivet.
Mr. Jenner did not agree with Mr. Bra-quet’s finding that the fasteners are no longer sitting on the joists or decking. From his inspection, every panel was on the joists. All the fasteners were tight. The dimples found around the rivets are common on metal roofs. Mr. Jenner then stated perhaps 10 percent of the roof had been damaged in the hurricane. While he agreed that the building experienced some pressure, he discounted Mr. Braquet’s theory that hurricane winds entered, pressurized the building, and blew out the roof corners, and that such an event was impossible from a wind engineering standpoint. He opined that wind from Katrina, at the location of the building, was about 73 miles per hour. Wind forces displaced roofing from along the windward eaves of the building, and a modest number of panels at the north end were damaged by impact. The largest area of damage was in the southwest corner. Mr. Jenner did not agree that damage to the building in Hurricane Gustav was proof that the roof had been severely compromised during Katrina.. On an aluminum roof, one factor contributing to deterioration is thermal expansion and contraction, which move the panels and “warble [or wobble] out” the fasteners holes. The holes gradually become larger and, eventually, the fasteners must be replaced with larger ones. The roof failed because it did not have the strength it was expected to have when installed.
Mr. Jenner agreed that the roof panels and rivets were better than ordinary quality. In his opinion, HCLP does not need a new roof but does need repairs by increasing the structural strength and sealing it. Mr. Jenner did not find Mr. Fuenzalida credible, and he opined that Mr. Braquet was demonstrably and technically incorrect. He also did not believe the Murray report that there were | n holes in the roof in September 2005. Mr. Jenner conceded that the fasteners could have been leaking more after Katrina than before.
The jury found that Hurricane Katrina caused damage to HCLP’s building that was covered under the policy and that Lafayette had not adequately compensated HCLP. The uncompensated damages were for “$3,640,000.00 (20%) included.” The jury determined that Lafayette had not violated La. R.S. 22:658 by failing to initiate loss adjustment within thirty days, nor did it misrepresent facts or insurance policy provisions. It found that Lafayette did breach its duty of good faith under La. R.S. 22:1220 and that such failure of duty was arbitrary and capricious. The jury awarded $5,000 in penalties. Finally, the jury determined that Lafayette violated La. R.S. 22:658 by failing to make a written offer to settle within thirty days; however, this failure was not arbitrary and capricious.
Our review of the jury verdict is as follows:
It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.... To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong.... Where the jury’s findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of *627 appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s ruling is manifestly erroneous, or clearly wrong....
The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one.... Where there are two permissible views of the evidence, the fact-finder’s choice cannot be manifestly erroneous or clearly wrong....[1]
On appeal in its first assignment of error, Lafayette urges that it was legal error to permit Mr. Braquet to give expert opinion testimony which was not reliable and which was physically impossible. Lafayette contends that his testimony did not satisfy Daubert[2] requirements.
Lafayette argues that Mr. Braquet was permitted to testify that the winds of Hurricane Katrina pressurized the building through the ridge openings in the roof until the building gave way at its weakest points and that the pressurization caused the roof to uplift and become dimpled. According to Lafayette, the only methodology used to make this determination was his observation of the roof two years and eight months after the hurricane and his performance of the flat bar test, which Mr. Braquet stated was not any type of certified test. Lafayette contends, among other things, that Mr. Braquet did not measure the amount of movement or perform any testing to determine the amount of stress the building experienced; that he did not measure the distribution or depth of the dimples; and that he did not determine the maximum sustained pressure. Lafayette urges that Mr. Braquet failed to explain how his observed effects were a result of over-pressurization or simply wear and tear.
Prior to trial, Lafayette filed a Motion in Limine seeking to. limit Mr. Bra-quet’s testimony to only those opinions contained in his deposition and report and, further, to preclude him from opining on any building or structure not related to the HCLP building. A memorandum in support of this motion was attached. Also attached is a “Memorandum in Support of Daubert Motion in Limine,” urging that Mr. Braquet failed to state his methodology used in arriving at his conclusion and that he was qualified as an architect but not as an engineer. There is no motion for a Daubert hearing in the record. At the hearing on the Motion in Limine, Lafayette urged that Mr. Braquet had done no testing to substantiate his theory regarding the effects of pressurization on the building. The trial , court denied that portion of the motion, finding that, in the absence of any testing, there was no methodology to examine and that the jury would be entitled to weigh Mr. Braquet’s testimony. (Lafayette’s representation to the trial court that no tests (i.e., methodology) were conducted by Mr. Braquet is somewhat at odds with the current assignment of error.) The second portion of the Motion in Limine was granted.
Assuming that a motion for a Daubert hearing was properly made, there is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclu *628 sions derived from that application.[3] Daubert comes into play only when the methodology used by the expert is being questioned.[4]
Mr. Braquet was qualified at trial as an architect and was thoroughly cross-examined by Lafayette. At the time Mr. Braquet testified as to the flat bar test, he made it clear that the test was not standard or certified, and no objection to the admissibility of his testimony was made at trial. The failure to make a contemporaneous objection in the trial court waives the right of a party to complain about the ruling on appeal.[5]
Further, Lafayette’s argument over the “physical impossibility” of Mr. Braquet’s theory is based on Mr. Jenner’s testimony and essentially urges this court to question or weigh the testimony of Mr. Braquet in favor of its own 114witness. It should be noted that the jury heard evidence regarding Mr. Braquet’s qualifications and was free to afford his testimony whatever weight it deemed appropriate. A trial court may give whatever weight it deems appropriate to the testimony of any and all witnesses, including that of experts.[6] It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence.[7]
In the next assignment of error, Lafayette contends the court committed legal error when it allowed HCLP to introduce evidence regarding damage done to the building by Hurricane Gustav. HCLP contended that the roof was compromised during Katrina and in the position to fail in a less significant event such as Gustav. Lafayette’s pre-trial objection to this evidence was renewed during the trial testimony of Mr. Fuenzalida. Lafayette urges that this was a new theory not disclosed by HCLP’s experts prior to trial on in discovery. On appeal, Lafayette argues that it was not given time to conduct discovery or prepare a defense on this issue; that evidence regarding Gustav damage was irrelevant; and that its probative value outweighed by the danger of unfair prejudice. Lafayette cites us to Williams v. Gen. Motors, Inc.[8] in support of its position. Williams is inapplicable on its facts. There, the plaintiff sought to introduce a new theory of liability not previously claimed and which was elicited “almost as an afterthought.”[9]
Lafayette argues it was not given notice of inspections of the roof after Hurricane Gustav or any reports of any inspections and that admission of such evidence was “trial by ambush.” As HCLP points out, Lafayette noticed the corporate deposition of HCLP in December 2008. At that time, it requested, |15among other things, information on “[d]amage to the roof caused after Hurricane Katrina.” Whether or not *629 such information was obtained in that deposition or otherwise, Lafayette was clearly aware of the existence of this issue and cannot be heard to argue that it was blindsided by the testimony.
Further, the evidence was relevant as an attempt to prove the roof was compromised following Hurricane Katrina, one of the issues of the trial. As the trier of fact, the jury was free to weigh this evidence to determine the relationship between the two hurricanes vis-a-vis the roof, if any. Lafayette argues that the evidence was confusing and misleading and that by the end of trial, the jury was unable to distinguish between what roof damage was caused by which hurricane. Lafayette seeks to illustrate this argument by urging that the jury failed to credit its award for the $317,000 amount paid by HCLP’s current insurer following Hurricane Gustav. We disagree. Given the testimony indicating that the present cost to replace the roof was between three and a half to four million dollars, the jury’s award of $3,640,000 with “20% included” could easily have encompassed any credit. There is nothing to indicate any confusion on the part of the jury.
In its next assignment of error, Lafayette asserts it was error to allow the testimony of Mr. Spence. In seeking to exclude his testimony, Lafayette urged the trial court that it did not receive Mr. Spence’s report until five days before trial, well beyond the discovery deadlines. HCLP admitted that its fax of the report had not gone through, but it argued that it had also mailed the report. The trial court ordered HCLP to produce Mr. Spence for a deposition on the first day of trial and allowed him to testify the following day. Lafayette argues this was unfair and prejudicial.
The record shows that Mr. Spence was listed in discovery responses and in the joint pre-trial order as a witness. The record further indicates no objection by 11fiLafayette until the morning of trial. Mr. Spence was timely identified as a witness, and Lafayette has not demonstrated prejudice due to his testimony.
In its next assignment of error, Lafayette urges that the court erred in allowing the jury to hear the expert opinions of Mr. Paul Murray, Jr. and Mr. Fuenzalida when neither was qualified as an expert.
The requirements of expert testimony are set forth in La. C.E. art. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
Formal education or training in a particular field is not always necessary to qualify as an expert in a particular field; experience alone is sufficient.[10] It is well-established that the trial judge has wide discretion in determining whether to allow a witness to testify as a expert, and his judgment will not be disturbed by an appellate court unless clearly erroneous.[11]
The court sustained defense objections as to Mr. Murray, Jr.’s opinions on the *630 design or conclusions on what he observed, allowing him to answer questions as to his observations in his capacity as a licensed general contractor. When asked what he told Mr. Fuenzalida, Mr. Murray answered that he believed a new roof was needed. Lafayette cross-examined Mr. Murray with regard to his expertise. On review, we find that Mr. Murray’s testimony was clearly elicited as a contractor who had experience in designing roofs similar to the one at issue, and we find no abuse of discretion.
|17Lafayette complains that Mr. Fuenzalida gave opinion testimony as to the “blow out” at the corners of the building, thus opining as to how the damages were caused. Mr. Fuenzalida, while identifying a photograph, testified that “[i]t just shows the force of the winds ripping it and tearing it away. It was more of an explosion type lift off. It didn’t just— They pulled the bandage off fast instead of slow. That would be a good way to describe it.” Looking at another photo he stated, “That is a close-up. This is a more far-away one of that same corner, again, where it blew out from there.” Lafayette objected that he was giving expert opinions, and the court sustained the objection. Mr.. Fuenzalida also testified the contract for the roof stated it would last fifty years plus, and he anticipated no problems. The court sustained Lafayette’s objection to this line of questioning. Because the trial court properly limited this testimony, we find neither prejudice nor an abuse of discretion.
Lafayette next contends the trial court improperly prevented it from using the deposition of Mr. Sparks. On the fourth day of trial, Lafayette submitted to the court that it was unable to contact Mr. Sparks, who had been listed as a witness and requested to submit his deposition in lieu of live testimony. The court denied the motion, allowing the deposition as a proffer. The court felt it would put the plaintiff at a disadvantage “since had they known prior to today they might have been able to do something, or they might have been able to craft their questions to some of their other witnesses in a different way.”
La. C.C.P. art. 1450, in part, states:
A. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Louisiana Code of Evidence applied as though the witnesses were then present and testifying, may be used against any party who was present or represented at the taking of the | ^deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
[[Image here]]
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds:
(a) That the witness is unavailable;
(b) That the -witness resides at a distance greater than one hundred miles from the place of trial or hearing or is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition; or
(c) Upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
The trial court has much discretion in determining whether to allow the use of deposition testimony at trial, and its decision will not be disturbed upon review in the absence of an abuse of that discre *631 tion.[12] In the present case, it appears that Lafayette did not bring the issue of Mr. Sparks’ unavailability to the attention of either the court or HCLP until the fourth morning of trial. Lafayette did not offer any evidence to the court of its attempts to subpoena Mr. Sparks’ presence, and no service returns were introduced. Under these circumstances, we cannot say the trial court abused its discretion in refusing to admit the deposition.
Lafayette contends there is no competent evidence that the roof needs to be replaced. In briefing this assignment of error, Lafayette re-urges the foregoing assignments of error. We need not revisit those issues.
Next, Lafayette alleges the jury erred in adding 25 percent to its “award for penalties under R.S. 22:658.” In this assignment of error, Lafayette contends that 119HCLP argued to the jury, in closing, that Mr. Spence’s estimate for roof replacement, plus 25 percent penalties, equaled $3,640,648, almost the exact amount of the jury’s award. Lafayette concludes on appeal that the 20 percent referenced by the jury in awarding the cost of replacing the roof was, in actuality, the 25 percent penalty provided for in former La. R.S. 22:658 (now R.S. 22:1892). The jury interrogatories clearly show the jury did not find Lafayette to have been arbitrary and capricious so as to trigger penalties under that statute. Further, there was testimony from Mr. Murray that costs of replacing the roof would include a 20 percent estimate for contractor overhead and profit. This assignment of error is purely conclusory.
Next, Lafayette asserts the jury erred in awarding any penalties as there is no evidence in the record that it was arbitrary and capricious in failing to pay the claim within sixty days under La. R.S. 22:1220 (now R.S. 22:1973). At trial, Mr. Challenger testified that Lafayette received the loss notice on October 12, 2005. Payment for what Lafayette determined was due for repairs was tendered on December 31, 2005. There does not appear to have been a dispute that repairs, at least, were necessary. While an insurer need not tender payment for amounts that are reasonably in dispute, the courts have explicitly found that “there can be no good reason” — or no probable cause-for withholding an undisputed amount.[13] Where there is a substantial, reasonable, and legitimate dispute as to the extent or amount of the loss, the insurer can avoid the imposition of penalties only by unconditionally tendering the undisputed portion of the claim.[14] Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due.[15] Under the present facts, we find no error in the award for penalties under La. R.S. 22:1973.
Finally, Lafayette asserts the trial court improperly failed to credit Lafayette for those amounts paid by it as well as for the amount of money paid by HCLP’s insurer at the time of Hurricane Gustav. The jury interrogatories asked for an amount due to HCLP for uncompensated damages. There were no jury instructions regarding credits which may have been due for previous payments. However, in *632 closing arguments, counsel for HCLP conceded that Lafayette was entitled to a credit “because they have paid $467,000 and the expenses that were paid to patch and temporarily repair this roof totaled $232,000.... [Mr. Fuenzalida] has spent $232,000 in temporary repairs ... until the credit that they are entitled to, and we don’t dispute that, is $235,000.”
It is not entirely clear from the jury interrogatories whether the jury factored in any credit they 'may have found was due. However, given the wording of the interrogatory and the testimony on the cost of replacing the roof, as we have found above, the jury award could have encompassed any credit due to Lafayette.
Considering the record in its entirety, we find there was a reasonable basis in the record to support the jury’s award.
For the foregoing reasons, the judgment is affirmed.

AFFIRMED.

. Rabalais v. Nash, 06-0999 (La.3/9/07), 952 So.2d 653, 657 (citations omitted).

. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Tadlock v. Taylor, 02-0712 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 26, writ denied, 03-3265 (La.3/12/04), 869 So.2d 819; Carrier v. City of Amite, 08-1092 (La.App. 1 Cir. 2/13/09), 6 So.3d 893, writ denied, 09-0919 (La.6/5/09) 9 So.3d 874.

. Dinett v. Lakeside Hosp., 00-2682 (La.App. 4 Cir. 2/20/02), 811 So.2d 116, writ denied, 02-0835 (La.5/24/02) 816 So.2d 853; Carrier, supra.

. Hyland v. Am. Guarantee and Liab. Ins. Co., 04-305 (La.App. 5 Cir. 9/28/04), 885 So.2d 30; Anderson v. Bd. of Supervisors of La. State Univ. and Agric. and Mech. Coll. ex rel. La. State Univ. Health Sci. Center, 06-153 (La. App. 5 Cir. 10/17/06), 943 So.2d 1198.

. Curole v. Curole, 02-1891 (La. 10/15/02), 828 So.2d 1094.

. Salassi v. Salassi, 08-510 (La.App. 5 Cir. 5/12/09), 13 So.3d 670.

. 639 So.2d 275 (La.App. 4 Cir.1994).

. Williams, supra.

. Mistich v. Volkswagen of Germany, 95-0939 (La. 1/29/96), 666 So.2d 1073; Pyles v. Weaver, 06-0348 (La.App. 4 Cir. 5/16/07), 958 So.2d 753, writ denied, 07-1674 (La. 11/2/07), 966 So.2d 603.

. Mistich, supra; Pyles, supra.

. State in the Interest of Bordelon v. Guichard, 94-1795 (La.App. 1 Cir. 5/5/95), 655 So.2d 1371, writ denied, 95-1405 (La.9/15/95), 660 So.2d 454; Boutte v. ABC Ins. Companies, 00-0649 (La.App. 4 Cir.2/6/02), 811 So.2d 30.

. Louisiana Bag Co., Inc. v. Audubon Indem. Co., 08-0453 (La. 12/2/08), 999 So.2d 1104.

. Id.

. Id.